## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Ian D. Smythe, being first duly sworn, do hereby depose and state:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of

Criminal Procedure for a search warrant to search the person of Frank Lewis Salerno (hereinafter

"Salerno"), and the residence believed to be occupied by Salerno, which is located at 202 Dewey

Avenue, Apartment 1, Pittsfield, Massachusetts, 01201 (the "Subject Premises"), and as more

particularly described in Attachment A, for the items enumerated in Attachment B, which

constitute evidence, contraband, fruits and instrumentalities of violations of Title 18, United

States Code, Section 2251(a), Section 2252A(a)(2), and Section 2422(b), which criminalizes the

production of child pornography, attempted production of child pornography, receipt and

possession of child pornography, and the online enticement of minors for sexual activity. I request

authority to search the entire Subject Premises believed to be occupied by Salerno, including the

residential dwelling, outbuildings and storage areas to which Salerno may have access, and any

computer and computer media located therein where the items specified in Attachment B may be

found, and to seize all items listed in Attachment B as contraband and instrumentalities, fruits,

and evidence of crime.

2.      I have been employed as a Special Agent of the FBI since June 2003, and am currently

assigned to the FBI's Boston Division, Springfield Resident Agency. While employed by the FBI,

I have investigated federal criminal violations related to high technology or cybercrimes, child

exploitation, and child pornography. I have gained experience through training with the FBI,

Department of Justice, the National Center for Missing and Exploited Children, and the Internet

Crimes Against Children (ICAC) Task Force, among others, and through everyday work relating

to conducting these types of investigations. I have conducted numerous investigations involving

child pornography and child sexual exploitation, and have observed and reviewed countless

examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including

computer media. I am an FBI-certified and trained Digital Exploitation Technician, with multiple

FBI, government, and industry certifications in digital forensics, network analytics, and

cybersecurity. I hold a Master of Science degree from Boston University in Computer

Information Systems, with a postgraduate certification in digital forensics. Moreover, I am a

federal law enforcement officer who is engaged in enforcing federal criminal law, including 18

U.S.C. §§ 2251 and 2252A, and 2422, and I am authorized by the Attorney General to request a

search warrant.

3.     The statements contained in this Affidavit are based on my personal observations, my

training and experience, as well as information obtained from other agents and witnesses. Since

this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not

included every fact known to me concerning this investigation. Rather, I have set forth only the

facts that I find necessary to establish probable cause to believe that Frank Lewis Salerno

possessed and distributed child pornography, and enticed a minor to engage in sexually explicit

conduct, in violation of Title 18, United States Code, Section 2251(a), Section 2252A(a)(2), and

Section 2422(b).

## THE INVESTIGATION

4.     On July 25, 2019, Cooperating Witness 1 (CW1) reported to the FBI in Rochester, New

York, that his daughter, Minor Victim 1 (MV1), a 14-year-old female, had received sexually

explicit communications from Instagram account "franksalerno89" (hereinafter, the "Subject

Account"). CW1 stated that MV1 first began communicating with the Subject Account around on

or about June 2019, when she was 13 years old, and that MV1 had recently turned 14 years old in early July 2019.

5.      Publicly available information associated with the Subject Account indicated that it belonged to an adult male, named "Frank Salerno", residing in Massachusetts. Instagram is an application that is available throughout the world and can be used on either a computer or mobile device.

6.      CW1 subsequently downloaded the contents of MV1's Instagram account, to include her communications with the Subject Account, and provided the account information to the FBI on July 26, 2019. CW1 also provided the FBI with MV1's cellular phone and a written consent to search the phone.

7.      On July 27, 2019, FBI agents reviewed the contents of MV1's Instagram account and observed sexually-explicit communications between MV1 and the Subject Account. The communications took place from June 21, 2019 through July 23, 2019 and became increasingly sexual in nature.

8.      Agents observed a conversation string between the Subject Account and MV1 from July 14, 2019, where the Subject Account stated to MV1: "Show ur tummy more hunny", "Show me those legs hunny cause damn u got even more sexy" and "What about touching urself". Later in the conversation, the Subject Account stated "Feel me go in u" to which MV1 stated "Ok..". The Subject Account stated "U feel it" to which MV1 stated "Yeah..". The Subject Account stated "U scared" to which MV1 stated "A little". The Subject Account then stated "Ur hand down there" to which MV1 stated "Yeah..". The Subject Account responded by stating "Show" to which MV1 stated "Hold on my mom walked in..". A short time later the Subject Account stated "Ok", "Show me inside" and "Finger deep". The Subject Account then requested photographs from MV1, who

replied by sending non-pornographic images depicting her stomach, among other things. The Subject Account commented on these photographs by stating "Ur so sexy".

9.      The conversation strings between MV1 and the Subject Account contained multiple references to "videos" or "video calls" between the Subject Account and MV1. At approximately 10:22pm on July 14th, the Subject Account attempted to initiate a video call with MV1, to which MV1 messaged "I can't video chat.. I want to but I can't.. my mother is still awake and she could come in.." The Subject Account replied by asking MV1 to send a picture instead.

10.     On July 30, 2019, CW1 gave verbal consent for the FBI to take over MV1's Instagram account and assume MV1's identity to further communicate with the Subject Account. Thereafter, an undercover agent (the UCE), posing as MV1, began to communicate with the Subject Account.

11.     On July 31, 2019, the UCE sent an Instagram message to the Subject Account stating "Morning" and "Missed u". The Subject Account responded "Hey". Shortly thereafter, the Subject Account asked MV1 to send a photograph showing what MV1 was wearing.

12.     In order to ensure that the user of the Subject Account was aware of MV1's age, at 14:32 on July 31st, the UCE sent the Subject Account the message "I thought once I turned 14 my mom would leave me alone more lol". The Subject Account acknowledged MV1's age by responding "Kr" and "Ikr". Based on my training and experience, I know that "Ikr" is an abbreviation for the phrase "I know, right".

13.     Further conversations ensued on July 31st in which the Subject Account engaged in sexually explicit conversations with the UCE. The Subject Account stated "Do u like it rough" to which the UCE stated "Like what? ?". The Subject Account responded with "When i am rough" to which the UCE stated "Huh", "Rough with wut" and "I sry". The Subject Account then stated "Sex" to which the UCE stated "Oh umm idk I've never done anything with a boy yet", "But Def

4

not with my boobs. They r off limit. Insecure avout them" and "Does it hurt being rough???". The Subject Account then stated, "Idk u tell me" and "Like choking and stuff".

14.     At approximately 14:33 on July 31st, the UCE messaged the Subject Account "Ugh hate it hear", to which the Subject Account responded "Then come here to me", and "Would u like that". The Subject Account then suggested the UCE could "be my gf". The Subject Account then attempted to engage in additional sexual conversation, and asked the UCE to send the Subject Account a picture from the bathroom.

15.     Later on July 31st, the Subject Account requested more photos of MV1. The UCE responded by stating "Ok. Wut u like to see :)" to which the Subject Account stated "Everything". The UCE then stated "Everything? ??" to which the Subject Account stated "Yes legs first then tummy then ur fingers in ur pussy". In response, the UCE sent a photograph which has been approved for undercover use in these types of investigations. The photograph depicts a side view of a female's midsection. The Subject Account responded by stating "Hmm sexy". Further conversations ensued in which the Subject Account requested again photographs of MV1 by stating "Ur legs and ur fingers in ur pussy", "And u moaning".

16.     During the conversations with the UCE, the Subject Account sent two photographs to the UCE. One of the photographs had previously been posted on the Instagram profile of the Subject Account. The other depicted an adult, Caucasian male wearing glasses and a green shirt.  These two photographs are attached as Exhibits 1 and 2.

17.     Utilizing a database available to law enforcement, FBI agents conducted a search for "Frank Salerno," and identified a person with that name and a date of birth (DOB) "07/11/1989" residing in Massachusetts. A Massachusetts RMV search yielded an RMV photo for Frank

Salerno, DOB 07/11/1989, which appeared to be the same Caucasian male observed in the photographs the Subject Account sent to the UCE.

18.     On August 7, 2019, a federal search warrant was requested and approved by U.S. Magistrate Judge Marian Payson of the Western District of New York authorizing a search and seizure of the Subject Account. FBI agents executed the warrant via Facebook's law enforcement portal, and on August 26, 2019, agents obtained the records produced by Facebook related to the Instagram account of the Subject Account.

19.     On September 13, 2019, detectives with the Massachusetts State Police (MSP) Berkshire State Police Detective Unit (SPDU) contacted the Massachusetts Probation Services' Electronic Monitoring (ELMO) Program who were able to provide a "real time" ping of an ankle Global Positioning System (GPS) monitor, assigned to Frank Salerno, which showed his location at 202 Dewey Avenue in Pittsfield, Massachusetts. MSP detectives then submitted an information request to ELMO regarding the current address and one month of historical GPS data for Salerno.

20.     MSP detectives subsequently contacted Salerno's state probation officer who confirmed Salerno's current address to be 202 Dewey Avenue, Apartment 1 in Pittsfield, Massachusetts. The apartment is on the first floor, on the right side, after entering the front common entrance and Salerno resides there with his mother and her boyfriend. Salerno previously resided on an upper floor until approximately one month ago. Salerno was not ordered to abide by any curfews in Pittsfield but was restricted with certain exclusions which require him to stay away from the City of Haverhill, Massachusetts including a victim and certain schools within the city.

21.     On October 17, 2019, FBI agents reviewed the records provided by Facebook/Instagram and observed a July 14, 2019 conversation between MV1 and the Subject Account in which the Subject Account was engaging in sexual communication with MV1. Furthermore, the user of the

Subject Account states "Ur hand down there" in which MV1 stated "Yeah..". The Subject

Account then stated "Show" in which MV1 stated "Hold on my mom walked in..", to which the

Subject Account responded by stating "Ok". MV1 then sent a photograph to the Subject Account

in which she is wearing what appears to be a green shirt with jean shorts, with her hand inside of

her jean shorts near her vagina. The Subject Account then replied "Show me inside". MV1 then

sent another picture to the Subject Account with her shorts pulled down and her hand covering

her vagina. The Subject Account responded with "Finger deep", to which MV1 replied "Mhm..".

A copy of this picture is attached as Exhibit 3.

22.     On October 23, 2019 FBI agents met with MV1 in order to verify the identity of the

individual depicted in the images sent by MV1 to the Subject Account. Agents showed MV1 the

images and MV1 confirmed the images were of her and that she had sent the images to the

Instagram user "franksalerno89" while in her home, which is located in the Western District of

New York.

23.     The Facebook/Instagram records also showed that the Subject Account solicited images

from multiple teenage girls on Instagram.  The records also showed that the Subject Account

follows more than 1000 Instagram accounts, and these appear to be predominantly accounts of

teenage girls.

## CHARACTERISTICS COMMON TO INDIVIDUALS WITH INTENT TO COLLECT, RECEIVE OR DISTRIBUTE CHILD PORNOGRAPHY

24.     Based on my previous investigative experience related to child pornography

investigations, and the training and experience of other law enforcement officers with whom I

have had discussions, I know there are certain characteristics common to individuals with intent

to view and/or possess, collect, receive, or distribute images of child pornography:

a.      Individuals with intent to view and/or possess, collect, receive, or distribute child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.      Individuals with intent to view and/or possess, collect, receive, or distribute child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Individuals with intent to view and/or possess, collect, receive, or distribute child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their films, videotapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain photos, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.      Likewise, individuals with intent to view and/or possess, collect, receive, or distribute pornography often maintain their collections that are in a digital or electronic

format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

e.      Individuals with intent to view and/or possess, collect, receive, or distribute child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.      Individuals who would have knowledge about how to access online forums, such as bulletin boards, newsgroups, Internet relay chat or chat rooms are considered more advanced users and therefore more experienced in acquiring and storing a collection of child pornography images.

g.      Individuals with intent to view and/or possess, collect, receive, or distribute child pornography prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

25.      Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

26.     Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer. In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper. Photos taken on a digital camera are stored on a removable memory card in the camera. These memory cards often store up to 64 gigabytes of data, which provides enough space to store thousands of high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the camcorder to a computer. Additionally, almost all cell phones today can record high-resolution photographs and videos.

27.     A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

28.     The computer's ability to store images in digital form makes the computer itself an ideal

repository for child pornography. The size of the electronic storage media (commonly referred to

as the hard drive) used in home computers has grown tremendously within the last several years.

These drives can store thousands of images at very high resolution. In addition, there are

numerous options available for the storage of computer or digital files. One-terabyte external and

internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and

"thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on

the computer. It is extremely easy for an individual to take a photo with a digital camera or a cell

phone, upload that photo to a computer, and then copy it (or any other files on the computer) to

any one of those media storage devices (CDs and DVDs are unique in that special software must

be used to save or "burn" files onto them). Media storage devices can easily be concealed and

carried on an individual's person.

29.     The Internet affords individuals several different venues for obtaining, viewing, and

trading child pornography in a relatively secure and anonymous fashion.

30.     Individuals also use online resources to retrieve and store child pornography, including

services offered by Internet portals such as Yahoo! and Hotmail, among others. The online

services allow a user to set up an account with a remote computing service that provides e-mail

services as well as electronic storage of computer files in any variety of formats. A user can set up

an online storage account from any computer with access to the Internet. Even in cases where

online storage is used, however, evidence of child pornography can be found on the user's

computer or external media in most cases.

31.     As is the case with most digital technology, communications by way of computer can be

saved or stored on the computer used for these purposes. Storing this information can be

intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's

favorite websites in, for example, "bookmarked" files. Digital information can also be retained

unintentionally, e.g., traces of the path of an electronic communication may be automatically

stored in many places (e.g., temporary files or Internet Service Provider client software, among

others). In addition to electronic communications, a computer user's Internet activities generally

leave traces or "footprints" in the web cache and history files of the browser used. Such

information is often maintained indefinitely until overwritten by other data.

### REGARDING THE SEARCH AND SEIZURE OF DIGITAL EVIDENCE

32.     Based upon my training and experience and information related to me by others involved

in the forensic examination of computers, I know that computer data can be stored on a variety of

systems and storage devices including hard disk drives, floppy disks, compact disks, and memory

chips. I also know that during the search of the premises it is not always possible to search

computer equipment and storage devices for data for a number of reasons, including the

following:

> a.     Searching computer systems is a highly technical process which requires specific
>
> expertise and specialized equipment. There are so many types of computer hardware
>
> and software in use today that it is impossible to bring to the search site all of the
>
> necessary technical manuals and specialized equipment necessary to conduct a
>
> complete search. In addition, it may also be necessary to consult with computer
>
> personnel who have specific expertise in the type of computer, software application or
>
> operating system that is being searched.
>
> b.     Searching computer systems requires the use of precise, scientific procedures
>
> which are designed to maintain the integrity of the evidence and to recover "hidden,"

erased, compressed, encrypted or password protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.   The volume of data stored on many computer systems and storage devices can often be so large that it would be highly impractical to search for data during the execution of the physical search of a premises. As an example: a single megabyte of storage space is the equivalent of 500 double spaced pages of text, while a single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double spaced pages of text.

d.   Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.

13

Therefore, a substantial amount of time is often necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

## CONCLUSION

33.     Based on the foregoing information, I respectfully submit that there is probable cause to believe that Frank Salerno, using the Subject Account, has committed the crimes of production of child pornography, receipt of child pornography, and the online enticement of a minor to engage in sexual activity, in violation of 18 U.S.C. §§ 2251(a), 2252A(a)(2)(A), 2242(b), by attempting to persuade, induce, and entice MV1 to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct. There is further probable cause to believe that evidence of the listed offenses is located on the premises described in Attachment A, and that this evidence, listed in Attachment B, is contraband, the fruits of crime, or things otherwise criminally possessed, and/or is property which is or has been used as the means of committing the foregoing offenses. I therefore respectfully request that the attached warrant be issued authorizing the search for and seizure of the items listed in Attachment B.

34.     Due to the ongoing nature of this investigation, and the possibility of seriously jeopardizing the effectiveness of the investigation if information were made public, I request that the search and seizure warrant and this application be sealed until the execution of the warrant.

Ian D. Smythe
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
This _21st_ day of November, 2019

14

HON. KATHERINE ROBERTSON
United States Magistrate Judge

## ATTACHMENT A – I

Subject Frank L Salerno is described as a 30-year-old white male, date of birth 07/11/1989, 6'0, approx. 200 lbs. (Massachusetts RMV record at Exhibit A).

## Massachusetts Driver's License



| | | |
|---|---|---|
| **Number** S16796566 | **Sex** M | **DOB** 07-11-1989 |
| **Height** 6' 00" | **Weight** | **Expires** 07-11-2020 |
| **Eye Color** | **Hair Color** | **Issued** 08-03-2015 |
| **SSN** 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 | | |

| | Licenses | |
|---|---|---|
| **Type** | **Class** | **Status** |
| Non CDL | D | ACT |

**Name and Mailing Address**
SALERNO, FRANK L
202 DEWEY AVE
PITTSFIELD, MA 01201

**Massachusetts Specific Information**

| | |
|---|---|
| Military: | 0 |
| Drivers Ed.: | 0 |

## ATTACHMENT A-2

The subject premises are located at 202 Dewey Avenue, Apartment 1, Pittsfield, Massachusetts, near the corner of Dewey Avenue and Linden Street, approximately two blocks west of Tucker Park. Subject premises consist of a standalone, west-facing, multi-story, multi-residence building with yellow siding and white trim. An unpainted wooden porch extends off the front of the residence, with unpainted external wooden stairs and porches leading to additional entries on the north, south, and (to the rear) east facings of the building.







## ATTACHMENT B

### LIST OF ITEMS TO BE SEIZED

1.      Computers, computer hardware, computer software, computer-related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, cameras, film, cellular telephones or other video display and storage devices that can access, record, store, and/or display images or videos of child pornography or child erotica or information pertaining to an interest in child pornography or sexual activity with minors.

2.      Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs, including, but not limited to, peer-to-peer software.

3.      In any format and medium, all originals, computer files, copies, and negatives of child pornography and child erotica.

4.      Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs, text messages, and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography or other activities involving the sexual exploitation of children.

5.      Any and all diaries, address books, or other lists of names and addresses of individuals who may have been contacted by subject, by use of the computer or by other means, for the purpose of distributing or receiving child pornography or otherwise engaging in the sexual exploitation of children.

6.      Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that pertain to:

        (a) accounts with an Internet Service Provider;

(b) online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage; or

(c) occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.